MANNHEIM INSURANCE COMPANY v. ERIE & WESTERN TRANSPORTATION COMPANY.

May 25, 1898.

Nos. 10,993—(86).

Connecting Carriers — Schedule of Interstate Rates — Rate Sheet — Uniform Bill of Lading—Limitation of Liability—Rate for Common-Law Liability.

Two connecting carriers, engaged in interstate commerce, filed with the interstate commission a schedule of rates, called "Official Classification," and also a rate sheet called "Joint East-Bound Interstate Tariff." The former stated, specifically and in detail, the rates under a certain form of bill of lading, called "Uniform Bill of Lading," limiting the common-law liability of the carriers, and further stated that the rates on property not shipped subject to the conditions of the Uniform Bill of Lading were a specified percentage higher than the reduced rates under the Uniform Bill of Lading. The rate sheet stated that all rates were to be used in connection with, and subject to, the Official Classification. *Held*, that this was making and establishing schedules of rates both under the Uniform Bill of Lading, and also under the full common-law liability.

Same—Reference in Rate Sheet to Official Classification.

Also, that the reference in the rate sheet to the Official Classification made the latter a component and concomitant part of the schedule of rates.

Same—Reasonableness of Rates.

Also, that, even if the rates under the full common-law liability were unreasonable and exorbitant, this fact would not render the rates under the limited liability invalid, provided they were themselves reasonable.

Same—Evidence of Combination against Anti-Trust Law.

Also, that there was no evidence in this case that the rates fixed were

the result of a combination or association formed in violation of the act of congress called the "Anti-Trust Law."

**Same—Limitation of Liability—Consideration.**
 Also, that the evidence showed a consideration for the limitation of the common-law liability of the carrier.

Action in the district court for Ramsey county to recover $1,920.64, the amount paid by plaintiff for the loss by fire of 750 sacks of flour covered by its policy of insurance. The other facts are stated in the opinion. The case was tried before Kelly, J., who found in favor of defendant. From an order denying a motion for a new trial, plaintiff appealed. Affirmed.

*Warner, Richardson & Lawrence,* for appellant.

*T. R. Palmer* and *Palmer & Beek,* for respondent.

MITCHELL, J.

A somewhat extended statement of the facts is necessary to an intelligible decision of this case:

The defendant was a common carrier operating a line of vessels between the city of Milwaukee and various other ports on the Great Lakes, including Erie, Pennsylvania, where it connected with the Pennsylvania Railroad Company, with which it had a traffic arrangement whereby it was authorized to issue through bills of lading from Milwaukee to Baltimore. The defendant and the Pennsylvania Railroad Company duly established, issued, published, and filed with the interstate commerce commission a schedule of basic freight rates, designated as the "Joint East-Bound Interstate Tariff" (Exhibit 1), covering class freight rates on merchandise, including flour, shipped via the through line, consisting of the two companies, from Chicago or Milwaukee to Atlantic seaports, including Baltimore. This schedule stated that all rates were to be used in connection with, and subject to, the Official Classification No. 14.

This Official Classification (Exhibit 2) had been issued, published, and filed with the interstate commerce commission, and was used in connection with, and as a part of, the Joint East-Bound Interstate Tariff. One copy of this Joint Interstate Tariff was posted in a conspicuous place on the wall in defendant's office in Milwaukee,

and another in a book, open to, and in use by, the public, upon a table in the office. Copies of the Official Classification were also kept on a desk in the office near the door, for the use of the public. The same things were done in defendant's office in St. Paul. The interstate commerce commission received and accepted, and have always treated, this Official Classification and Joint East-Bound Interstate Tariff as a compliance with the laws of congress and the orders and directions of the commission.

The rate on flour from Milwaukee to Baltimore, as fixed by the Joint East-Bound Interstate Tariff, was 12 cents per 100 pounds, but in connection with, and subject to, the Official Classification. The rate fixed by the Official Classification was 12 cents per 100 pounds, if shipped subject to the "Uniform Bill of Lading conditions," but, if not shipped subject to the Uniform Bill of Lading conditions, property would be "charged twenty per cent. higher than as herein provided  *  *  *  and cost of marine insurance." The Official Classification further provided:

"(1) Unless otherwise provided in this classification, property will be carried at the reduced class rates specified herein, if shipped subject to the conditions of the Uniform Bill of Lading.  *  *  * If shipper elects not to accept the said reduced class rates and conditions, he should so notify the agent of the receiving carrier at the time his property is offered for shipment, and if he does not give such notice it will be understood that he desires his property carried subject to the Uniform Bill of Lading conditions in order to secure the reduced class rates thereon. Property carried not subject to the conditions of the Uniform Bill of Lading will be at the carrier's liability, limited only as provided by common law, and by the laws of the United States and of the several states, in so far as they apply. Property thus carried will be charged twenty (20) per cent. higher (subject to a minimum increase of one [1] cent per one hundred pounds), than if shipped subject to the conditions of the Uniform Bill of Lading, and the cost of marine insurance will be added over any part of the route that may be by water."

The Uniform Bill of Lading limited the common-law liability of the carrier as follows:

"No carrier  *  *  *  shall be liable for any loss thereof or damage thereto [to property described in the bill of lading] by causes beyond its control, or by floods or by fire," etc.

It further provided that it was mutually agreed, in consideration of the rate of freight therein named, that every service to be performed by any carrier under the bill of lading should be subject to all the conditions therein contained, which the shipper thereby agreed to and accepted.

One Sheffield, at Walcott, Minnesota, was a manufacturer of flour, which he had been accustomed for years to ship to British and Irish ports over the Chicago, Milwaukee & St. Paul Railway to Milwaukee, and thence to the Atlantic seaboard over the line consisting of defendant's vessels and the Pennsylvania Railroad. In making these shipments he had always received and accepted the Uniform Bill of Lading. Printed copies of the Joint East-Bound Interstate Tariff and of the Official Classification had been regularly mailed to him,—as often, at least, as once a year; but he testified that he could not say that he had ever read them, or ever had his attention called to any rate of freight from Milwaukee to the seaboard over this line, except 12 cents per 100 pounds, as he was always after the lowest rate. The court finds that, by the exercise of ordinary care, he could have seasonably advised himself of the contents of the Official Classification.

October 1, 1894, the plaintiff issued to Sheffield its open or blanket policy, insuring him against loss by fire on all shipments made by him within one year to European ports. The policy provided that upon payment of any loss the insurer was to be subrogated to all the rights of the assured under the bills of lading, to the extent of such payment.

Subsequently Sheffield communicated with the defendant; asking for a rate from Milwaukee to London for 30 car loads of flour, to be shipped in separate lots from time to time during the month of August, 1895. The defendant neither owned, nor had any traffic arrangement with, any ocean transportation company; but it entered into negotiations with a steamship line, and secured a guaranty of a rate from Baltimore to London of $7\frac{1}{2}$ cents per 100 pounds on the 30 car loads to be shipped as proposed by Sheffield. This rate was for ocean transportation under the Uniform Bill of Lading, limiting the liability of the carrier. After this arrangement was consummated, Sheffield commenced shipping the flour,

and had delivered to the defendant several of the 30 car loads, for which the defendant delivered, and Sheffield accepted, through Uniform Bills of Lading to London at 19½ cents freight per 100 pounds from Milwaukee to London; this being made up of 12 cents from Milwaukee to Baltimore, and 7½ cents ocean freight.

While, as we understand the facts, the defendant had nothing to do with the transportation of the flour from Walcott to Milwaukee, yet by the bills of lading it acknowledged the receipt of the flour at Walcott, and became responsible for the transportation of it from that point. The advantages of this arrangement to Sheffield, by enabling him to contract in advance for the sale and delivery of his flour in London, and in negotiating his draft with the bills of lading attached, are too apparent to require explanation.

One shipment of 750 sacks of the flour was, without any negligence or want of due care on the part of the defendant, destroyed by fire during the life of plaintiff's policy, in defendant's warehouse at Milwaukee, while awaiting shipment on one of its vessels. The plaintiff paid the loss to Sheffield, took from him an assignment of the bill of lading and of all claim thereunder against the defendant, and then brought this action against it to recover for the loss.

Defendant's counsel make the points (1) that it, being a carrier exclusively by the Great Lakes, is not subject to the interstate commerce act; and (2) that it is exempted from liability for this loss by fire by R. S. (U. S.) § 4282. We shall assume, without deciding, that neither of these points is well taken.

Plaintiff's contention is that the defendant is liable as insurer, as at common law, notwithstanding the provision to the contrary in the bill of lading, for the following reasons:

(1) Inasmuch as the flour was specially classified in the Joint East-Bound Interstate Tariff sheet, and it was not necessary to refer to the Official Classification in order to ascertain its class, the words in the tariff sheet, "subject to Official Classification," did not apply.

(2) That it was the duty of the carrier to make and publish a rate with full common-law liability, and that this could be done only by

stating upon the Joint East-Bound Interstate Tariff sheet the common-law rate, either in figures, or by some appropriate language; that the words, "subject to Official Classification," did not inform the shipper that he is to look any further than the tariff sheet for the rate.

(3) That, assuming that the rate for full common-law liability had been properly published, it was exorbitant and unreasonable, and therefore void, under both the common law and the interstate commerce act.

(4) That the alleged common-law rate was the subject of a combination of all the trunk lines and their connections carrying merchandise between Chicago or Milwaukee and Atlantic ports, in violation of the act of congress known as the "Anti-Trust Act." 26 St., c. 209.

1. The first and second of these propositions may be considered together. The conclusion sought to be drawn from the proposition that no rates with full common-law liability were ever made and published is that it was the duty of the carrier to make and publish such rates; and if only one schedule of rates was ever made and published, that must necessarily have involved full common-law liability, notwithstanding anything in the schedule or the bill of lading to the contrary.

It will be discovered, by an examination of the interstate commerce act (25 Stat. 855–6, c. 382, § 6), that all it requires with reference to through joint rates over connecting lines is that the schedules shall be filed with the commission, and such publicity given to them as may be directed by it. It is stipulated that the schedules were so filed, and it does not appear what, if any, publicity the commission has ever required to be given to them, or that the defendant or the Pennsylvania Railroad Company has ever failed to comply with any direction of the commission in that regard. The rate sheet, standing alone, does not constitute the schedule of rates required by the law, but is only a part of it; the other part being the Official Classification referred to in it, and filed with it; and the two must be read together, as component parts of the schedule of rates. We think this is so understood and treated by the interstate commerce commission, and generally by shippers. The Offi-

cial Classification is quite a voluminous document, containing minute rules and regulations on a variety of subjects. It is impracticable to incorporate all these into the rate sheets; for rates are liable to constant changes, which may be made on a few days' notice, while the Official Classification, including rates and regulations, is very seldom changed. To compel the carrier to reissue the Official Classification every time a rate is changed would involve a great hardship and needless expense. Therefore, as we understand it, the commission has always recognized the Official Classification as a concomitant part of every schedule of rates, when proper reference thereto was made in the rate sheet. See Annual Report 1897, p. 85.

It is a matter of common knowledge that the great bulk of the freight of the country is now transported under bills of lading limiting the common-law liability of the carrier. It is the exception, and not the rule, for property to be carried under the full common-law liability. Hence, where the difference between the two rates is fixed upon a horizontal percentage basis, it would seem to be a very convenient method to state specifically and in detail only the rates under the Uniform (or limited liability) Bill of Lading, under which the great bulk of the business of the country is done, and then to state generally the percentage of increase over these rates where goods are transported with full common-law liability. All a proposed shipper under the common-law liability has to do is to refer to the Official Classification, to ascertain the rates under the Uniform Bill of Lading, and then add the percentage. This is a mere matter of arithmetical calculation. The fact (which is stipulated) that the interstate commerce commission has always treated this as a compliance with the laws of congress regulating commerce, and with the orders and directions of the commission, although perhaps not conclusive, is quite persuasive, upon this point.

In this case, under the evidence and findings of the court, Sheffield knew, or is chargeable with knowledge of, the contents of the Official Classification, and that the rate sheet, or Joint East-Bound Interstate Tariff, was to be used in connection with, and subject to, the Official Classification. With this knowledge, he consented and

agreed to ship his property under the Uniform Bill of Lading, and thereby assented to and accepted all its terms and conditions.

2. Assuming that the rate for full common-law liability was unreasonable (of which there is no proof, unless we are to take judicial notice of the fact that it is out of proportion to the rates under the limited liability), this will not render void the rates under the Uniform Bill of Lading, if they are in themselves reasonable, and the conditions of the bill of lading are not in conflict with public policy.

3. All that is necessary to be said of plaintiff's fourth proposition is that there is no evidence that the rates established were the subject or result of a combination and agreement among the trunk lines and their connections in violation of the Anti-Trust Act.

In view of what has been already said, it can hardly be necessary to add that there is nothing in the point that there was no consideration for the limitation on the common-law liability of the defendant.

Order affirmed.